1

G5KVCONC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4            v.                          15 CR 537 (VEC)

5   RASHAAD CONYERS,

6               Defendant.               BAIL REVIEW

7   ------------------------------x

8                                        New York, N.Y.
                                         May 20, 2016
9                                        2:00 p.m.

10

11  Before:

12                  HON. VALERIE E. CAPRONI,

                                         District Judge
13

14                       APPEARANCES

15

    PREET BHARARA,
16       United States Attorney for the
         Southern District of New York
17  DINA McLEOD
         Assistant United States Attorney
18

    BRADLEY L. HENRY
19       Attorney for Defendant

20

21

22

23

24

25

G5KVCONC

```
1              (Case called)

2              THE COURT:  Mr. Henry, this is your motion.

3              You're requesting a reconsideration?

4              MR. HENRY:  Yes, I think that's probably the right

5    characterization.

6              As the Court is aware and just as a little background,

7    we sought release for Mr. Conyers in this case previously --

8              THE COURT:  I remember.

9              MR. HENRY:  -- prior to the superseding indictment.

10             Now we are in a position where there has been a

11   superseding indictment filed.  The charges are a bit different.

12             The impetus for my request to reopen the hearing are

13   essentially two pieces of evidence that have come out since the

14   last hearing in front of this Court, the first of which is

15   there has been DNA testing on the .45 caliber gun, which was

16   the gun that was in question during those hearings which

17   Mr. Conyers originally was alleged to have simply possessed and

18   is now alleged to have used to do a shooting in aid of

19   racketeering.

20             The second piece of evidence is a video of, I assume,

21   a cooperating witness at this point that was taken in the

22   precinct by the state detectives wherein he is interviewed

23   about the incident where two guns were recovered.  The

24   interview happened on May 20th, they say.  They don't give a

25   date when the guns were recovered, but they say a few days ago,
```

G5KVCONC

1    where he admits, one, to having the .45 caliber -- to be the

2    one shooting the .45 caliber and dropping the .45 caliber and

3    running.  They question him about these video surveillance

4    issues.  So those two pieces of evidence, Mr. Conyers -- no DNA

5    on the weapon -- and some other individual admitting that he

6    had and was firing that weapon.

7              THE COURT:  How many guns were recovered?

8              MR. HENRY:  There were two guns that were recovered.

9    There was a .45 caliber Hi-Point automatic or semiautomatic

10   pistol.  The other weapon was a .22 six-shot revolver, I think,

11   that had a little tan handle on it; it was a big black weapon.

12             As the Court may recall, in the complaint of this case

13   there were a number of things that were said not only in the

14   complaint of the case, but during the hearings from this case.

15             In the previous hearings, the government had alleged

16   in the August 20th hearing in front of the magistrate a few

17   things.  One is that two police officers saw the weapon that

18   Mr. Conyers allegedly tossed, saw him toss the gun.  The

19   defendant -- that was the gun that fired the bullets because

20   they recovered shell casings and an unfired bullet, all of

21   which are .45 caliber bullets.  They didn't recover any .22

22   shell casings and haven't alleged, to my knowledge, the .22

23   caliber was fired at all ever.

24             The government also stated that the witness -- I'm

25   assuming this is the individual that has previously said that

1    he was the one shooting the .45 –– ID'd Mr. Conyers and said

2    that he was the one doing the shooting.  The complaint says

3    throughout it, it identifies Firearm No. 1 as the .45 caliber

4    weapon; and it goes on to say that it was tossed by

5    Mr. Conyers, that it is, in fact, a .45; and that those .45

6    caliber casings were found.  They have subsequently been

7    tested, ballistics have been done and so on and so forth.  But

8    there is nothing on the casings, no fingerprints, no DNA or

9    anything taken from that to connect it to Mr. Conyers.

10          So as a result of that, the government, in their

11   letter that was filed just this morning, says that really

12   doesn't make a difference in this case.  I quite disagree.  I

13   think it makes a pretty big difference in this case.  The

14   reason being is even though the charges have changed in terms

15   of context and seriousness, for that matter, for each of the

16   counts the Mr. Conyers faces, the government has to prove that

17   he was in possession or conspired to be in possession of or

18   shoot or do something with that .45 caliber weapon.

19          For the RICO case, they have alleged that one of the

20   two predicates they have to prove is, in fact, the shooting

21   with the .45; so if they can't prove that, then they have no

22   RICO case.

23          The felon-in-possession, obviously if Mr.  –– and they

24   admitted as much in their letter, if they can't prove

25   Mr. Conyers possessed it, they can't prove that charge.

G5KVCONC

1          The 924(c) is the use in furtherance of.  Again, in

2     relation to this weapon and the attempted murder in aid of

3     racketeering was alleged to be this shooting, not his prior

4     attempt which he has already served his state sentence for.

5          As a result of that, I think that does a couple of

6     things.  We talked to the magistrate judge about how can we

7     reasonably assure that Mr. Conyers is not a danger to the

8     community sufficient to overcome the bail argument and the

9     presumption that now exists.

10          THE COURT:  That now exists that did not exist at the

11     time.

12          MR. HENRY:  That's correct; it does now exist.

13          But case law is really pretty clear around the country

14     that the presumption is rebuttable, just it needs some

15     evidence.  There are some cases that say putting a defendant on

16     an ankle monitor overcomes the presumption.  The fact that he

17     was working with the Harlem Justice Corps and had graduated and

18     was doing a number of things with them would overcome that

19     presumption.  At that point then the question is how do we

20     reasonably assure the safety of the community.  It's not

21     guaranteed, the safety of the community, because there's no way

22     to do that, and comply with the Bail Reform Act, because the

23     Bail Reform Act was enacted, as we all know, to make sure that

24     individuals could get bail; it is skewed that way on purpose.

25          Gang membership alone is not sufficient to overcome

G5KVCONC

| | |
|---|---|
| 1 | the presumption; that's from a Fifth Circuit case, *U.S. v.* |
| 2 | *Jackson*, which is 845 F.2d 1262.  Past danger alone, the |
| 3 | attempted murder, which he has already served his sentence for, |
| 4 | alone is not sufficient. |
| 5 | THE COURT:  How about the fact that he was seen firing |
| 6 | a weapon while he was on parole for that offense, from the |
| 7 | standpoint of dangerousness? |
| 8 | MR. HENRY:  That's true. |
| 9 | Well, the argument would be that he wasn't seen firing |
| 10 | a weapon; he didn't fire the weapon; his DNA is not on it. |
| 11 | THE COURT:  Just because his DNA wasn't on it doesn't |
| 12 | mean he didn't touch the gun or fire the gun. |
| 13 | MR. HENRY:  Certainly. |
| 14 | THE COURT:  We've all been around that bush before. |
| 15 | You don't always get fingerprints; you don't always get DNA. |
| 16 | MR. HENRY:  That's true. |
| 17 | THE COURT:  The government has a little party when |
| 18 | they find the DNA, but it's not the end of the world if they |
| 19 | don't have DNA. |
| 20 | MR. HENRY:  That's true.  I agree with that.  An |
| 21 | expert would certainly say that. |
| 22 | The more compelling evidence is you have another |
| 23 | individual admitting that it was him shooting the gun, not |
| 24 | Mr. Conyers.  It's pretty convenient that that cooperating |
| 25 | witness is now saying, Oh, yeah, Mr. Conyers shooting the gun, |

G5KVCONC

1    that's fine; of course he would say that.

2            So I think the level of evidence that the government

3    alleged existed in this case in the prior hearings, which was,

4    We've got a guy saying Mr. Conyers was shooting the gun, I have

5    the police saw him doing it.

6            The police didn't just see him shoot a gun; no one saw

7    him shoot the gun, if he did shoot the gun.

8            THE COURT:  It's on video.

9            MR. HENRY:  It's on a video.  The Court, I believe,

10   watched it --

11           THE COURT:  I did.

12           MR. HENRY:  -- the last time.  And you can see some

13   things.  It's my opinion -- and the Court certainly can

14   disagree -- that you can't see a gun, you can't see what the

15   gun looks like, you can't even see the faces of the individuals

16   who are in the video.

17           THE COURT:  That's true.

18           What you can see is a motion that is consistent with

19   aiming and firing a gun.  Don't you see a flash?

20           MR. HENRY:  I do not see a flash.

21           THE COURT:  I don't remember.  I can't remember

22   whether you can see a flash or do you hear a pop.

23           MR. HENRY:  I don't think there's any sound on the

24   video.

25           THE COURT:  It's a raise like that, and then something

G5KVCONC

```
 1    happens, and then they take off running.

 2             MR. HENRY:  Yes.  It's two individuals, and they sort

 3    of do one of these kind of things, a ducking sort of motion,

 4    and then they take off running back the other direction.  To

 5    the extent that that can be consistent with firing a gun, it

 6    can also be consistent with dodging someone shooting a gun --

 7             THE COURT:  Now, it's clear that one of those two men

 8    had a gun and was aiming it, my recollection is, and shooting

 9    it in the courtyard area or right outside of a public housing

10    project.

11             So I guess, Mr. Henry, what I would ask you to address

12    is even if your client didn't fire the gun, if he's one of the

13    two guys, how have you overcome the presumption?  Because what

14    I'm concerned about is the safety of the community.

15             MR. HENRY:  Of course.  Of course.

16             Here are a few things that shed light on that and

17    provide us some context to ensure or reasonably ensure safety

18    of the community, particularly in that area, because all of

19    these crimes and the RICO conspiracy all have alleged to have

20    occurred in this housing community up on 145th and Third Avenue

21    approximately.

22             THE COURT:  I got the idea that there are warring

23    gangs that have turf.

24             MR. HENRY:  So there is one issue which was addressed

25    in magistrate court, maybe not as much so here, is that
```

G5KVCONC

Mr. Conyers doesn't live in that community; he lives with his

mother.  And as I put on the record in magistrate court, it's

at least a 15-minute car ride, at least a 15-minute subway

ride, and it takes about an hour and-a-half, hour and 20

minutes, to walk from one place to the other.

        So for Mr. Conyers, if he is placed in his mother's

home and placed on a GPS ankle monitor and placed on strict

supervision and house arrest and he is not leaving his home,

then we can assure that he's not going to be in that community;

he's not going to be over at 145th and Third, because as soon

as he walks out of his house and it's an hour and 20 minutes

walking away, then somebody is going to know about it.  I think

that, one, it overcomes the presumption; and two, it provides

us with some insurance that he's not going to be over there

doing what it was that he's alleged to have been doing.

        Two is even assuming he was one of the two guys,

right, and taking at face value that he was present during that

time --

        THE COURT:  Well, there is an indictment which carries

some weight.

        MR. HENRY:  That's right, because it's been to the

grand jury.

        THE COURT:  Correct.

        MR. HENRY:  Somebody sat there and listened to it and

said, All right.  There's enough there to issue an indictment.

G5KVCONC

1        But, again, that's probable cause finding, which is
2   much less, much less than the standard at trial, which is
3   beyond a reasonable doubt.  Mr. Conyers is still, as he sits
4   here, presumed to be innocent --
5        THE COURT:  Absolutely.
6        MR. HENRY:  -- in this case.  And so that's sort of
7   the lodestone starting point for all of these things.
8        We know the size of this case.  The Court is well
9   aware at this point of the size and magnitude of the number and
10  volume of information in this case and the types of charges
11  that are involved.  This is a case that's going to go for a
12  while, right.  Mr. Conyers holding that presumption of
13  innocence, but then being detained for trial for -- it has
14  already been a year.  It was a year I think about a week ago,
15  May 13th or 14th, when he first came in.  So he's already been
16  in for 12 months on this case and presumably for many, many
17  more months, if not a year or so before we ever get to a trial
18  to decide these issues.
19        The quantifiable nature of the evidence in this case
20  is essentially this:  You've got casings, you've got a firearm
21  recovered, you've got eyewitness testimony from an officer.
22  Eyewitness testimony has obviously inherent problems, not
23  because the officer is going to get up there and lie or
24  anything like that, but eyewitness testimony is faulty because
25  we're humans.

G5KVCONC

1          We have cooperator testimony, who at some point has

2     said that Mr. Conyers was shooting a gun, but has also

3     contradicted himself originally and said that he was the one

4     shooting the gun.  That's really pretty unreliable testimony,

5     even if that wasn't true because of the nature of it.  There is

6     no DNA.  It boils down to two individuals saying Mr. Conyers

7     did what they say he did.  So in the stratosphere of cases,

8     it's not necessarily the strongest case.

9          I will point out that the level of evidence in a case

10     is probably the least important point.  Courts have pointed out

11     that that's probably the lowest of the other standards.

12          I think for Mr. Conyers, when he got out of prison,

13     another thing that sort of ensures for us that he was on the

14     right path or could have been on the right path --

15          THE COURT:  Well, he could have been, but what he was,

16     at a minimum, he was in gang territory and present at a

17     shooting.

18          MR. HENRY:  Well, we know he was at 145th and Third

19     because that's where he was arrested.

20          THE COURT:  As I remember, the police officers hear

21     the shot and then see him running; and they pair that with the

22     video that he was the guy who was there.

23          MR. HENRY:  I will say this:  We'd be here a long time

24     watching all the videos.  But my watching of the video, which

25     I've done numerous times to this point, and written out

G5KVCONC

timelines and tried to map it all out, what I found is this:
What is a substantial amount of time?  There is an amount of
time between the time the gunshots are alleged to have been
fired and the time a police officer sees two individuals
running and they start chase.  It's 30 seconds or 45 seconds.
It's not gunshots and they see somebody and they start running,
right.  It's around the corner and all the way over in a
different part of the housing area.  So it's not an immediate,
"I hear gunshots, I look, and there's two guys, and I start
running after them."  It is not that.

          Then there is still this question of in the complaint
it says officers gave chase and then eventually Mr. Conyers was
arrested on 145th and Third.  In that sworn statement it says
nothing about they maintained eye contact the whole way.  Now,
the government alleges that the officers would say, I
maintained eye contact the whole way, which is the basis of my
request to have the officer come in at the previous hearing.
But there are factual issues in the proof and timeline of this
case that cause us some concern.  But we know he was at 145th
and Third because he was arrested there, I have no question
about it.

          But proving the case and doing those things, him being
present at a location, he could have been running away from the
shots just like everybody else may have been, right.  He hears
gunshots and he takes off running; he runs to the cops and they

G5KVCONC

1   say, Oh, there's this guy that looks like the guy that got

2   called into the radio, and they arrest him, right.  Maybe

3   that's true, maybe it's not, I don't know.

4               But to overcome the bail issue --

5               THE COURT:  The presumption.

6               MR. HENRY:  The presumption.

7               THE COURT:  I had interrupted you.  You said he gets

8   out of jail, he could be on the right track, and I interrupted

9   you by saying, Well, he was at the scene of a shooting --

10              MR. HENRY:  Of course.

11              THE COURT:  -- which would not really qualify as the

12  right track.

13              MR. HENRY:  So going back, putting that sort of to the

14  side, he was going to the Harlem Justice Corps.  He had, while

15  he was there, completed a 12-week, 350-hour community service

16  project restoring a local church.  He had completed a Ready,

17  Set, Work employment readiness program and he was reporting to

18  the Justice Corps on a weekly basis at least in order to get

19  job training and try to find a job so that he could get to work

20  again.

21              He completed the Retention Works, which is an

22  internship and job retention curriculum developed by the New

23  York Department of Labor; he completed nine weeks and over 250

24  hours of a site mentorship internship at the Harlem Justice

25  Corps where he mentored new members, individuals who were

G5KVCONC

1   coming in to be part of the justice corps program.  He

2   graduated from the program in March 2005.  And we have lots of

3   nice --

4           THE COURT:  2005?

5           MR. HENRY:  2015, I'm sorry.

6           Lots of nice photos of him and his family at the

7   graduation, so forth.  Shows community support, ties to the

8   community and all of those things which the Bail Reform Act

9   talks about.

10          THE COURT:  I don't have any doubt he's got good ties

11  to the community.  I'm not concerned about flight.

12          MR. HENRY:  He received an award for outstanding

13  personal growth in his cohort's graduation ceremony.  The

14  letter goes on to say -- this is from Allison Trenk, who's the

15  program manager, and I can hand this up if the Court wants to

16  read it, but it says:  While Rashaad's accomplishments are

17  impressive, they don't fully capture the transformation that

18  took place while he was at the Harlem Justice Corps.  He worked

19  on his behavior by utilizing cognitive behavior therapy, which

20  they call CBT.  In CBT, a person must look at a situation

21  objectively and they need to identify thoughts and attitudes

22  and feelings related to that situation and connect to those

23  thoughts and attitudes in order to change their behavior and

24  understand the problematic behavior that they've had in the

25  past.

G5KVCONC

1      In any event, the people who were working with him in
2      that program had a lot of really great things to say about him
3      and what he was doing during his time, trying to use it
4      productively while he was out on parole.
5      I will mention to the Court, I think this is worth
6      mentioning, that he is on parole and I think continues to be.
7      There has been no violation filed as a result of that.  The
8      Bail Reform Act, 3142, has a procedure for which the government
9      goes through what they believe that that's going to be an
10     issue, it's like a ten-day -- same thing with an illegal
11     immigrant or illegal alien where they look to see if there is
12     going to be some issue with that.  And that issue alone can't
13     be enough to hold Mr. Conyers in.  He is entitled to a hearing
14     and entitled to bail review regardless of the state parole
15     issue certainty at this point under 3142 structure.
16     I would suggest to the Court that with a sufficient
17     amount of bail, unsecured bail, signed by any number of
18     individuals, there are numerous individuals who would sign it.
19     THE COURT:  But nobody has any money.
20     MR. HENRY:  I think there are individuals who
21     certainly have jobs; they are financially-responsible
22     individuals.
23     THE COURT:  Okay.
24     MR. HENRY:  I think the signing of that very strict
25     supervision obviously, ankle monitor, home arrest, him being at

G5KVCONC

1    home and not permitted to leave unless prior permission is

2    given for very limited circumstances, drug testing obviously,

3    and all of the other standard conditions of release, I think if

4    those things are put in place for Mr. Conyers and he can meet

5    all of those conditions to obtain bail in this circumstance --

6    flight is not so much of an issue, he's not going anywhere --

7    that we can ensure that the place where these things are

8    alleged to have happened, 145th and Third, we can keep him away

9    from there very easily.  We can put restrictions on him that

10   make sure he is well away from that area and it keeps him in

11   the house, keeps him away from doing things that may get him

12   again in front of this Court looking at being revoked on bail

13   and other issues.

14          So I think overcoming the presumption, which is that

15   those things would take care of overcoming that presumption to

16   a certain extent, and the showing has to be small, with his

17   ties to the community and his family support and things that he

18   was doing positive in his life before he came in on this case,

19   the ankle monitor, the bond issue, monetary issues, all of

20   those things would be sufficient to reasonably assure that the

21   community is safe while Mr. Conyers is on bail.

22          So for those reasons, I'd ask the Court to set those

23   conditions.  Unless you have any other questions, I'll let the

24   government speak.

25          THE COURT:  Okay.

G5KVCONC

1          Ms. McLeod.

2          MS. McLEOD:  Yes, your Honor.

3          The defendant has not met his burden of --

4          THE COURT:  Let me just interrupt you for a second.

5          Is the defendant aware that I got some *ex parte*

6     information about the case?

7          MS. McLEOD:  No.

8          THE COURT:  They are now.

9          MS. McLEOD:  Yes.

10         THE COURT:  Okay.

11         So I got the same letter that you got, but with some

12    additional information filling out some information regarding

13    the government's case.

14         MR. HENRY:  I understand.

15         MS. McLEOD:  Much of what I have to say, I think, is

16    flushed out in detail in the submission.

17         As the Court noted, as defense counsel noted, there is

18    a presumption in this case.  The government submits that even

19    without that presumption, this is not a close case for bail.

20         There are four factors in the bail reform statute, one

21    of which is the weight of the government's case.  As the

22    government laid out in its submission, the two pieces of

23    evidence that the defendant characterizes as significantly

24    exculpatory, in fact, do not do much to undermine the strength

25    of the government's case and, in fact, defense counsel, I

G5KVCONC

 1    think, significantly underplays how strong the government's

 2    case is as to the May 12, 2015 shooting.

 3              I'll just make a couple of factual points.

 4              The first is that the May 12th, 2015 shooting

 5    underlies some of the charges that the defendant is facing, but

 6    not all of them.  For example, the racketeering conspiracy, I

 7    think defense counsel said that the racketeering conspiracy

 8    ties to this shooting.  While it's fair to assume that the

 9    government would use that shooting as proof of the racketeering

10    conspiracy, in fact, the overt act in Count One of the

11    racketeering conspiracy that's tied to Mr. Conyers is the 2007

12    attempted murder to which the defendant pled guilty.

13              In addition, the firearms count --

14              THE COURT:  I'm sorry.  For racketeering conspiracy,

15    do you have to prove two predicates?

16              MS. McLEOD:  Yes.  But no single person has to --

17              THE COURT:  Has to commit two predicates.  Okay.

18              MS. McLEOD:  So that's just one, sort of, factual

19    clarification.  And the same thing with the 924(c) count is

20    tied to the racketeering conspiracy, not to the

21    attempted-murder-in-aid-of-racketeering count.

22              So the May 12, 2015 -- the arguments related to that

23    are relevant to certain of the counts, but, again, it doesn't

24    address all of the charges that the defendant is facing and,

25    therefore, doesn't fully address the weight of the government's

1   case as to those charges.

2          But the government would submit that the evidence in

3   the May 12, 2015 case is extremely strong.  I think the Court

4   has identified the issue with the DNA exclusion; it's not

5   particularly meaningful, especially at this stage.  Certainly

6   it's fodder at trial if the defendant wants to bring that up

7   and argue it, but it's not something that is so significantly

8   exculpatory here that it warrants pretrial release.

9          The second point relating to the witness post-arrest

10  statement, so another important factual clarification here is

11  that, in fact, the government has always proffered as its

12  evidence and as, sort of, the events of May 12, 2015, that, in

13  fact, two defendants went into rival gang territory or two

14  people went into rival gang territory, one of which being the

15  defendant, each of which had a gun, both of whom fired the gun.

16         Defense counsel's argument that while the post-arrest

17  statement is really saying, I fired the gun, not him, the

18  theory has always been two defendants fired the gun, there were

19  two weapons recovered; and, in fact, that's something that the

20  government referred to on -- this is page 9 of the October 5th

21  bail hearing in front of your Honor, which is Exhibit B.

22         THE COURT:  Hang on just a second.

23         Page what?

24         MS. McLEOD:  Page 9.

25         THE COURT:  Okay.

G5KVCONC

1          MS. McLEOD:  And in about the middle of the page, the

2     government notes to the Court -- and this is as we're

3     describing what we believe the video shows, the government

4     believes that it is fairly clear that is what is happening.

5     Both of the defendants are raising their arms in a firing

6     motion and firing.  The Court then viewed the video.  I think

7     it's clear from the video that there's someone in a black

8     sweatshirt who raises his arm and fires.  And then immediately

9     after that, the defendant in a white T-shirt also fires.

10          So there's no, sort of, Well, the post-arrest

11     statement shows that, in fact, it was someone else; there was

12     another man who was doing it.  This is not inconsistent at all

13     with what the government has always said the case is, which is

14     that both people had a gun, and both people are -- both persons

15     fired the gun.

16          As set forth in the submission, because the attempted

17     murder charge includes aiding and abetting, both

18     co-conspirators are responsible for the other person's gun and

19     the other person shooting.  So it's really not relevant in this

20     case which gun the defendant possessed; although, again, that's

21     fodder for cross if the defendant wants to explore at trial

22     that there's some inconsistency about the gun, that's certainly

23     fair game.  But it's not something that so significantly

24     undermines the government's case as to the May 12th events.

25          There's quite a lot of evidence here.  There's more

G5KVCONC

1    evidence here, in fact, than many shootings charged by this

2    office.  The fact that the actual shooting is caught on video,

3    there is a cooperating witness, there is law enforcement

4    testimony who see both of the men and see them toss guns right

5    after the shooting, and then there is ballistic results from at

6    least one of the guns possessed by the men.  It's fairly strong

7    evidence that leads, sort of, from the very beginning, the

8    story that will be told in terms of walking into rival gang

9    territory, and then all the way towards the end where the law

10   enforcement sees the aftermath of the shooting and then see the

11   defendants fleeing, much of which is caught on video.

12        That's primarily what defense counsel's argument today

13   is focused on.  The government submits that that's simply not

14   enough to rebut the presumption when you consider exactly what

15   the government has always proffered to be the case, which is

16   that both co-conspirators had guns and both of them fired the

17   guns, and that's something that you can see on the video.

18        THE COURT:  So the statement that the other shooter

19   made on tape was, I fired my gun.  Does he say on tape,

20   Mr. Conyers did not fire a gun or Mr. Conyers was not there?

21        MS. McLEOD:  No.  Simply says, I was shooting the .45

22   is essentially the extent.

23        THE COURT:  Okay.

24        MS. McLEOD:  The other thing I would note -- and this

25   is not something that defense counsel dealt with at all -- is

G5KVCONC

 1    that the other three factors clearly weigh in favor of

 2    detention here, strongly in favor of detention here.  The

 3    defendant was on parole for a gang-related attempted murder; at

 4    the time he committed another gang-related attempted murder.

 5              In addition --

 6              THE COURT:  I'm sorry.

 7              He was in the other gang's territory?

 8              MS. McLEOD:  Yes.  He was in the territory -- he was

 9    in -- yes.

10              THE COURT:  He was arrested in the other gang's

11    territory.

12              MS. McLEOD:  I believe he was on the border at that

13    point.

14              THE COURT:  Okay.

15              MS. McLEOD:  The other thing that's particularly of

16    note for the Court's evaluation of pretrial release and

17    amenability to supervision is the defendant's behavior in

18    prison.  Since he's been in custody, he has not been on good

19    behavior; he has recently twice been subject to disciplinary

20    sanctions for violent behavior, once for assaulting another

21    inmate.  Just before this conference, legal counsel at the MDC

22    sent me the hearing report for that and gave me the details.

23    According to the discipline hearing report for the March 19th

24    assault -- and this was, A, on video and, B, admitted to by the

25    defendant at the hearing -- the defendant struck another inmate

G5KVCONC

1    with a closed fist to the face, and he continued to kick and

2    punch the other inmate in the body and dragged him.  This was

3    in the common area of his housing unit.

4            MR. HENRY:  Your Honor, I haven't seen a copy of that.

5        May I?

6            MS. McLEOD:  Because I just received that just now, I

7    do not have a copy of that hearing report.  I do have -- and

8    this is just the BOP sentry report.

9            THE COURT:  Okay.

10           MS. McLEOD:  I can decipher that for the Court; the

11   BOP sort of talked me through it as well.

12           It sort of lists the two -- essentially the two

13   disciplinary charges he faced when the incidents happened.

14   "DS" stands for disciplinary segregation.  So you can sort of

15   see the penalties that happen and you can see the dates of the

16   hearing.

17           The basics of the sentry -- or the facts in the sentry

18   report are set forth in the government submission on page 6.

19           What's particularly of note is that on March 29, 2016,

20   the defendant struck another inmate with a closed fist, kicked

21   and punched him in the body, dragged him in the common area.

22   He was placed in disciplinary segregation and then released

23   from disciplinary segregation about a month later.

24           Two weeks after being released from disciplinary

25   segregation, he gets in another fight with another inmate.  And

G5KVCONC

1    he again is sanctioned by being put in disciplinary

2    segregation, which he presumably is in right now.  As the

3    government notes in its submission, defendant filed this motion

4    for bail in early May.  After he filed that motion for bail, he

5    got in this fight with an inmate.

6          So there should be serious concerns here about the

7    defendant's ability to refrain from violence, the defendant's

8    ability to control himself, the defendant's ability to refrain

9    from impulsive behavior.  There's simply nothing in the record

10   here that demonstrates that there are some set of conditions

11   that could guarantee the safety of the community when even in

12   prison the defendant is not able to comport himself

13   appropriately.

14         Unless the Court has any further questions.

15         THE COURT:  I just have one.

16         Am I correctly remembering that it was Mr. Conyers

17   that had to be brought into the courtroom to get a DNA sample

18   from him?

19         MS. McLEOD:  Yes, that's correct.

20         THE COURT:  Okay.

21         Mr. Henry, do you have anything else you want to tell

22   me?

23         MR. HENRY:  Just real briefly.

24         I won't spend a lot of time on the government's

25   statement that their position has always been that there were

25

G5KVCONC

1   two guns that were fired.  There is no evidence in discovery,

2   zero, that the .22 was fired at all, period, ever.  There are

3   no casings.  It doesn't say whether the firearm was loaded or

4   not loaded at all.

5          THE COURT:  There's no question that Ms. McLeod -- I

6   think it was -- was it you or Mr. Enzer?

7          MS. McLEOD:  It was me, your Honor.

8          THE COURT:  Said --

9          MR. HENRY:  So two people raised their arm.

10         THE COURT:  No.  During the argument before me on bail

11  that there were two guns fired.

12         MR. HENRY:  Right.

13         THE COURT:  That was the proffer to me, is that there

14  were two guns fired.

15         MR. HENRY:  But there is no actual physical evidence

16  that that second gun was ever fired, ever.

17         THE COURT:  Okay.  So they didn't find the shell

18  casing?

19         MR. HENRY:  The gun was either not loaded at all or

20  fully loaded.  In either event, it wasn't fired; so there is no

21  evidence that it was fired.

22         THE COURT:  That's two radically different things.

23  The fact that there was not a bullet in the gun when they found

24  it does not mean it wasn't fired.  Even if it was fully loaded,

25  it doesn't mean it wasn't fired.

1          MR. HENRY:  When you think about a semiautomatic

2    pistol and you fire the gun, bullets released --

3          THE COURT:  Unless it misfires.

4          MR. HENRY:  -- the casing is dechambered, right.  In a

5    revolver, casings stay in the gun.  If there are no casings in

6    the gun, there are no -- in any event, in the hearing before

7    that, the testimony was -- or the statements were that two

8    police officers saw the defendant with a weapon, saw him toss

9    the weapon, and the ballistics report run by the NYPD

10   ballistics laboratory confirms the defendant's gun,

11   Mr. Conyers', in fact, did fire a number of rounds on the

12   block.  The only ballistics testing that has been done is on

13   the .45.  That's it.

14         THE COURT:  Okay.

15         MR. HENRY:  In any event, that's neither here nor

16   there really; that's trial issues.

17         I think as far as the disciplinary issues, the new

18   incident, I haven't really had an opportunity to speak to

19   Mr. Conyers about, so I don't know a lot about that.

20         I will say that the incident before that -- and I can

21   put on the record that having spoken to Mr. Conyers, he had a

22   hand injury; it was really pretty swollen.  There is a dispute

23   about -- and I don't have the hearing minutes or an email from

24   what they discovered, but it is my understanding that that was

25   not a fight, it was a basketball injury for which they had a

G5KVCONC

1    hearing and said, Why is your -- what's the problem?  And

2    because no one would admit on the record what happened, they

3    sanctioned essentially everybody and gave them 30 days in the

4    hole.  That's my understanding of that issue.

5            The second one I can't really shed any light on.

6            THE COURT:  His refusal to give a DNA sample until I

7    ordered him into court?

8            MR. HENRY:  So his refusal to give a DNA sample --

9    Mr. Conyers wanted the DNA testing done.  He was eager to have

10   DNA testing done.  The issue with him coming into court, I

11   think they had scheduled -- there are emails back and forth

12   between us on this issue, but I think we had scheduled and

13   talked about doing that testing on a Friday.  And I, without

14   having spoken with Mr. Conyers, said that would be fine.

15           Anyway, some issue came up.  His family was supposed

16   to come visit him that day or something like.  And so he

17   refused because he didn't want to miss what he had going on at

18   the jail that day.  Then when the Court ordered him in, he had

19   already told me at that point in an email, said, I'm ready to

20   go.  That's fine now.

21           So it wasn't an issue of him being obstinate --

22           THE COURT:  My recollection is that it was more than

23   one.  Am I misremembering that?

24           MR. HENRY:  Honestly, your Honor --

25           MS. McLEOD:  That's correct, your Honor.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

G5KVCONC

1          MR. HENRY:  -- I don't recall.

2          MS. McLEOD:  He refused to be produced twice.

3          MR. HENRY:  Okay.

4          THE COURT:  Okay.

5          Mr. Henry --

6          MR. HENRY:  In either instance, it was not, "I don't

7     want to go because I don't want them to swab me."  I think it

8     was more about --

9          THE COURT:  That's not the issue.  Whether he wanted

10    DNA taken or not, that's not the issue.  As I've said to all of

11    the defendants now several times, this notion of defendants

12    saying, "I'm not coming," when they've been directed to come to

13    court or to the U.S. Attorney's Office for samples is

14    unacceptable.  I don't know where that started, that it's okay

15    for an inmate to decide that his schedule is more important

16    than what's been directed by the Court.  So be that as it may.

17          MR. HENRY:  I understand, your Honor.

18          THE COURT:  Long story short, I don't think you've

19    overcome the presumption.  I am exceedingly concerned that this

20    defendant poses a very real risk to the community.  I am not

21    convinced that those risks could be mitigated by house arrest.

22    I think all of the points that you raise about the government's

23    evidence, I look forward to hearing them be developed and

24    presented to a jury.

25          I certainly appreciate the fact that Mr. Conyers has

G5KVCONC

1    the presumption of innocence.  I will guarantee that he is

2    entitled to that and that the jury understands it.  My desire

3    is to get at least one of these cases to trial pretty soon or

4    as soon as I can.  The delay is largely because of the

5    defendants need time with the discovery and that's important so

6    that the defendants can have a fair trial.

7              So your request for the bail determination to be

8    reconsidered is denied.

9              Anything further from the government?

10             MS. McLEOD:  No, your Honor.

11             THE COURT:  Anything further from the defense?

12             MR. HENRY:  No, your Honor.

13             THE COURT:  All right.  Thank you, all.

14                         *    *    *

15

16

17

18

19

20

21

22

23

24

25